THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
FRANK HENRY *et al.*, Appellants.

*Opinion filed December 4, 1970.*

CHARLES L. HUGHES and CALVIN B. THELIN, both of Aurora, appointed by the court, for appellants.

WILLIAM J. SCOTT, Attorney General, of Springfield, and WILLIAM R. KETCHUM, State's Attorney, of Geneva, (JAMES B. ZAGEL, Assistant Attorney General, and W. BEN MORGAN, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE WARD delivered the opinion of the court:

A jury in the circuit court of Kane County found Jack Gaddis and Frank Henry guilty of murder and each defendant was sentenced to a term of from 66 to 99 years in the penitentiary. A constitutional question gives this court jurisdiction on direct appeal. Ill. Rev. Stat. 1969, ch. 110A, par. 603.

On the morning of August 28, 1966, the body of Hallard Reece was discovered in a stream in Kane County known as Blackberry Creek. A pathologist performed an autopsy that day and found that death had been caused by a severe beating. In the opinion of the pathologist, death occurred between midnight and 4 A.M., August 28, 1966.

The decedent, the defendants, Joseph Nevins, Judy Gaddis Whitney and Janet Vincent had been on a tour of

taverns in Aurora throughout most of the evening of August 27 and up until about 12:45 A.M. on August 28. Judy Gaddis Whitney, a niece of the defendant Gaddis, testified that during the course of the evening she participated in several conversations with the defendants concerning the identity and occupation of the decedent. The defendants had been concerned whether the decedent was an agent of the Federal Bureau of Investigation and according to her testimony the defendants concluded that Reece was an agent. The four men left the two girls at a tavern in Aurora at about 12:45 A.M. and the defendant Gaddis at that time told Judy Whitney, she testified, that he and the defendant Henry would find out if Reece was in fact a member of the Federal Bureau of Investigation and he said that if Reece was, "there will be a dead son of a —."

The body of Reece was found on Sunday, August 28, and on Monday, August 29, the defendants left Aurora and, after brief stops in Missouri, Georgia and Alabama, arrived in Mississippi. In Mississippi, they were arrested on a charge of armed robbery. On September 8, 1966, the Kane County State's Attorney traveled to Laurel County, Mississippi, where the defendants were in custody and informed them that they were wanted for the murder of Hallard Reece in Illinois. Warrants of arrest were lodged as detainers at the Laurel County Jail. On November 29, 1966, the defendant Gaddis pleaded guilty to the Mississippi charge of armed robbery and the defendant Henry was found guilty of the charge after a trial which concluded on December 22, 1966.

The defendants were indicted in Illinois on the murder charge in June of 1968, about 18 months after the defendant Henry's conviction of armed robbery. The defendants were returned to Illinois on February 5, 1969, after extradition proceedings, and on February 17 the defendants sought a dismissal of the indictment because, they said, their rights to a speedy trial had been violated. After his Mississippi conviction the defendant Henry had filed an appeal in the

Supreme Court of Mississippi. The State's Attorney of Kane County communicated periodically by mail with the prosecuting attorney in Mississippi concerning the status of the appeal and it seems clear that it was the intention of the State's Attorney to prosecute the defendants for the murder of Reece but only when the Mississippi appeal proceeding had been completed. The State's Attorney wrote twice to the victim's father advising him of the status of the appeal in Mississippi and assuring him that the defendants would be prosecuted in Illinois. Shortly after the Supreme Court of Mississippi affirmed Henry's conviction, an indictment of the defendants was secured in Kane County.

The defendants contend that because of the delay in the commencement of the Illinois prosecution they were deprived of their constitutional right to a speedy trial which is assured under section 9 of article II of the Illinois constitution and the sixth amendment of the United States constitution. It is argued that the delay was unnecessary, since extradition was available to the Illinois authorities upon the entry of the judgments of conviction in Mississippi (Ill. Rev. Stat. 1969, ch. 60, pars. 18-49), that the delay was deliberate and solely for the convenience of the State, and that as a consequence of the delay the defendants suffered substantial prejudice.

It has been held that the constitutional guarantee of a speedy trial has a threefold purpose: (1) to prevent unduly oppressive incarceration prior to trial; (2) to minimize the anxiety and concern to an accused which attends a public accusation; and (3) to prevent undue interference with the accused's ability to defend himself. (*Smith* v. *Hooey*, 393 U.S. 374, 21 L. Ed. 2d 607, 89 S. Ct. 575; *United States* v. *Ewell*, 383 U.S. 116, 15 L. Ed. 2d 627, 86 S. Ct. 773; *People* v. *Tetter*, 42 Ill.2d 569.) In *Smith* v. *Hooey*, it was determined that on demand a State has a constitutional duty to make a diligent and good-faith effort to secure the re-

turn of an accused held in another jurisdiction and to afford him a trial. (See also, *Dickey* v. *Florida*, 398 U.S. 30, 26 L. Ed. 2d 26, 90 S. Ct. 1564.) The right to a speedy trial, clearly a fundamental protection of our constitutions (*Klopfer* v. *North Carolina*, 386 U.S. 213, 226, 18 L. Ed. 2d 1, 9, 87 S. Ct. 988), cannot be defined in terms of an absolute or precise standard of time, within which an accused must be given trial. (*People* v. *Love*, 39 Ill. 436, 442.) In deciding whether the constitutional assurance of a speedy trial has been breached, we have said that four factors are to be considered: the length of the delay; the reasons for the delay; the prejudice to the defendant; and whether the accused may be considered as having waived the right. (*People* v. *Tetter*, 42 Ill.2d 569.) We said in *Tetter* (p. 573): "Those factors cannot be considered in isolation, but must be viewed in their totality * * * in determining whether there was a denial of the constitutional right in any case."

As has been stated, the State's Attorney lodged a detainer against the defendants with the Mississippi authorities in September, 1966. The defendant Gaddis pleaded guilty to the Mississippi charge in November, 1966. The defendant Henry was found guilty on December 28, 1966, and then filed an appeal of his conviction in the Supreme Court of Mississippi. The conviction was affirmed by that court in April, 1968, and in June, 1968, the defendants were indicted in Kane County. The Governor of Illinois signed the extradition request in October, 1968. In November the Mississippi court ordered the extradition but it appears that because some members of the Kane County sheriff's office were absent from duty because of Asiatic flu the defendant were not returned to Illinois until February 5, 1969.

We have said that a delay in proceeding to trial may be so prolonged that prejudice will be presumed (*People* v. *Love*, 39 Ill.2d 436, 443). There was an interval between the judgment of conviction of Gaddis and Henry and their

appearance in court in Kane County of approximately 26 and 25 months, respectively. It is not entirely clear what events are used by the defendants to measure the delay of which they complain and this is understandable under the decisions which have considered the right to a speedy trial. (See *Dickey* v. *Florida,* 398 U.S. 30, 26 L. Ed. 2d 26, 33, Brennan, J., concurring.) If we use the interval we have just described as a measurement of delay, rather than the lesser interval from the time of indictment, we judge that we are placing the defendants' claim, when reasonably viewed, in its most favorable light. However, even from that position, we do not judge, under all of the circumstances here, that the delay was so inordinate as to create a presumption of prejudice as a matter of law. (*Cf. United States* v. *Perez* (7th cir. 1968), 398 F.2d 658; *People* v. *Tetter,* 42 Ill.2d 569.) The defendants maintain, however, that actual prejudice to them resulted from the delay in their prosecution. They claim that because of the passage of time, they were unable to locate a woman who would have testified in their behalf. The woman, who was identified only as "Louise" in the affidavit of the attorney who represented the defendants at trial, supposedly saw the defendants and danced with the defendant Henry in a tavern in Aurora where the defendants spent 20 to 30 minutes after they, according to their testimony, had left the company of the decedent. The affidavit did not describe when the proposed witness became unavailable to the defense, though she was described as a fellow employee of the mother of the defendant Henry. There was no showing that the proposed witness would have been available to testify had the defendants been brought to trial sooner. The same can be said with respect to the claimed unavailability of the defendant Henry's foreman, who, it was alleged, would have testified that Henry had spoken in a general way, prior to the date of the murder, of planning to travel to California or to the South. The proprietress of the tavern, who, it is

said by the defendants, also saw them at that time, testified she had no recollection of seeing them. They complain that they were prejudiced because her memory was dimmed by the passage of time. However, this complaint is too conjectural, considering the circumstances here, to be regarded as meritorious. (See *United States* v. *Perez* (7th cir. 1968), 398 F.2d 658, 659.) Too conjectural, also, is the claim of prejudice because an Aurora bartender, who testified at the trial, did not recall seeing the defendants in his tavern on the afternoon following the murder.

The defendants must be considered as having waived the right to a speedy trial because of their failure to demand to be brought to trial in Illinois. In *Tetter* we said (p. 575) "That rule consistently adhered to by the Federal courts, including the Seventh Circuit Court of Appeals, as well as by many State courts, requires defendant to make some demand for trial in order to assert a denial of his constitutional right to a speedy trial, otherwise it will be deemed waived. (*United States* v. *Perez* (7th cir. 1968), 398 F.2d 658, 661; *United States* v. *Maxwell* (2d cir. 1967), 383 F.2d 427, 441, *cert.* den. 389 U.S. 1043, and cases cited therein; *Chapman* v. *United States* (2d cir. 1967), 376 F.2d 705, 707; *United States* v. *Kaufman* (2d cir. 1963), 311 F.2d 695, 698, *cert.* den. 369 U.S. 803; *United States* v. *Lustman* (2d cir. 1957), 258 F.2d 475, 478, *cert.* den. 358 U.S. 880; *Merritt* v. *State* (1968), 244 Ark. 921, 428 S.W.2d 66; *State* v. *Pederson* (1958), 251 Minn. 372, 88 N.W.2d 13.)" Though both were aware that they were wanted in Illinois for the murder of Reece, neither defendant made any request for trial.

The remaining factor to be considered under *People* v. *Tetter*, 42 Ill.2d 569, is the reason for the delay. We find nothing in the record to suggest an intention on the part of the prosecuting authorities to hinder or embarrass the defendants in efforts they could make to meet the charge against them. One might infer from the State's Attorney's

correspondence with the Mississippi authorities and the father of the victim that he simply considered it more orderly to await the disposition of the Mississippi appeal than to bring the defendants to trial in Illinois before the completion of the Mississippi proceeding. One cannot discern any intent to prejudice or oppress. *People* v. *Love,* 39 Ill.2d 436.

Viewing the factors discussed in *Tetter* in their totality, we do not find that the constitutional right to speedy trial was violated.

The defendants complain, too, that the trial court erred in refusing to admit certain evidence offered for impeachment purposes. Judy Gaddis Whitney, who had given the most incriminating testimony against the defendants, had given a statement to the police at the time of the investigation of the crime. In the statement the witness told of the conversations of the defendants, in which they speculated whether the victim Reece was an agent of the Federal Bureau of Investigation. The defendant Gaddis said, according to her statement, that if Reece were, "there will be a dead son of a —." She used the statement frequently while testifying to refresh recollection. She denied on cross-examination that the police had made any promises to induce her to make the statement. She was not asked whether any threats had been made. While on cross-examination the witness was asked whether she had a conversation with Evelyn Warren, the aunt of the witness and a sister of the defendant Gaddis, regarding the statement the witness had given to the police. She first unequivocally denied any such conversation with Evelyn Warren. The witness also denied knowing a Mrs. Leutze or a Mrs. Bolden and then she said she did not remember talking with Mrs. Warren or anyone else in Mrs. Warren's presence concerning the statement. Mrs. Warren and Mrs. Leutze were later called as witnesses by the defendants. Each testified that early in 1967 in a restaurant in Aurora they, in the presence of Mrs. Bolden, had a conversation with the witness Whitney and that the

subject of the conversation was the statement Mrs. Whitney had furnished the police concerning the defendants. When Mrs. Warren and then Mrs. Leutze were asked to state the conversation with Mrs. Whitney, there were objections by the State on the ground that no foundation had been laid for such testimony. The objections were sustained by the trial court. An offer of proof was then made by the defendants to the effect that if Mrs. Warren and Mrs. Leutze had been permitted to testify they would have testified that Judy Gaddis Whitney had told them that she gave the statement only after being informed by the police that they would hold her if she did not furnish the statement. According to the offer of proof, Mrs. Whitney had also said that, at the time the police spoke to her, she was planning to move with her parents to Florida and did not want any interference with her plans. She said, too, that the police had told her that if she "played ball with them, they would play ball with her," Mrs. Leutze would have testified.

It is clear from the discussions in the record that the parties and the trial court considered that the defendants, through Mrs. Warren and Mrs. Leutze, were attempting to impeach the credibility of the witness Whitney on the basis of a prior inconsistent statement by the witness. This is, of course, a proper basis of impeachment. *People* v. *Moses,* 11 Ill.2d 84.

It would appear that no prior inconsistent statement in the usual sense was involved, but inconsistency in the literal sense is not always required for impeachment. In *Carroll* v. *Krause,* 295 Ill. App. 552, the witness testified that an auto in which the plaintiff was riding had but one headlight. At an earlier inquest the witness omitted mention of the fact of the single headlight. It was held that the prior statement was admissible for impeachment purposes, though the witness had not been asked specifically about the auto's headlights at the inquest. The court said at page 562: "The rule

is that the omission of a witness to state a particular fact under circumstances rendering it incumbent upon him to, or likely that he would, state such fact, if true, may be shown to discredit his testimony as to such fact. 70 C.J. 1061; Greenleaf on Evidence (16th Ed.) Vol. 1, sec. 462a." Where, as here, it is claimed there has been a material omission of matters contained in a prior statement from later testimony it is logical that the fact of such omission should be admissible. Wigmore says: "A *failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the nonexistence of the fact." (Wigmore on Evidence, (3rd ed. 1940), sec. 1042); see also, McCormick on Evidence (1st ed. 1954), sec. 34; *Erickson* v. *Erickson and Co.*, 212 Minn. 119, 2 N.W.2d 824.) It would have been natural for the witness to have told in her testimony of the claimed coercion.

It is true that before prior inconsistent statements of a witness, which are offered for purposes of impeachment, may be admitted into evidence a proper foundation must be laid on the cross-examination of the witness. This is typically done by directing the attention of the witness to the time, place, to whom made, other circumstances of the inconsistent statement, and the substance of it. (*People* v. *Perri*, 381 Ill. 244, 249-250.) The purpose of this is to protect the witness against unfair surprise and to provide an opportunity for him to explain the statement with which he is confronted. *People* v. *Moses*, 11 Ill.2d 84, 87.

The questions asked the witness Whitney on cross-examination did not meet the conventional and formal standards normally required to provide a foundation for impeachment through evidence of prior inconsistent statements of a witness. (See *People* v. *Perri*, 38 Ill. 244). No criticism can be directed at the trial judge for ruling, after thoughtfully and at length considering the problem, that a proper foundation had not been laid by the defendants.

However, we consider under the circumstances of this case that the foundation was adequate to permit the defendants to attempt to impeach the witness. The rationale of requiring a foundation is to protect the witness against unfair surprise and to permit his explanation of the prior statement. We believe the questions propounded on cross-examination did substantially satisfy the reasons for the rule requiring a foundation. Wigmore criticizes what he considers formalism in this regard. He says: "If the preliminary question is to be useful as a warning to enable the witness to prepare to disprove the utterance or to explain it away if admitted, it must usually specify some details as to the occasion of the remark. The witness may perhaps without this understand the occasion alluded to; but usually he will not, and in such a case this specification of the details is a mere dictate of justice. The modern tendency of American Courts, however, is to lose sight of the fact that this specification is a mere means to an end (namely, the end of adequately warning the witness), and to treat it as an inherent requisite, whether the witness really understood the allusion or not. The result of this is that unless the counsel repeats a particular arbitrary formula of question, he loses the use of his evidence, without regard to the substantial adequacy of the warning. Such a practice is impolitic and unjustified by principle." Wigmore, Evidence, (3rd ed. 1940), sec. 1029.

We would add that in any event it would have been within the discretion of the trial court to have permitted the recalling of the witness for the purpose of perfecting the foundation, had the defendants sought to call the witness. See *Aneals* v. *People,* 134 Ill. 401.

The credibility of Judy Gaddis Whitney was a highly important, even pivotal question, for the jury's consideration. We judge that the defendants should have been allowed to attempt to impeach the witness.

We need not, in view of this holding, consider whether

the offered testimony would have been admissible on another ground.

We reverse the judgments and remand the cause for a new trial.

*Reversed and remanded.*